Somil Trivedi (*pro hac vice application forthcoming*)
American Civil Liberties Union Foundation
Criminal Law Reform Project
915 15th St., NW
Washington, DC 20005
Telephone: (202) 715-0802
strivedi@aclu.org

Jared G. Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org

***Attorneys for Plaintiffs***

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Samuel Luckey and Michael Calhoun, on behalf of themselves and those similarly situated, and<br><br>Arizona Attorneys for Criminal Justice,<br><br>Plaintiffs,<br><br>v.<br><br>Allister Adel, in her official capacity as County Attorney for Maricopa County<br><br>Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1.     In Maricopa County's Early Disposition Courts (EDCs), prosecutors warn every single person they charge that if the person requests a preliminary hearing—a right under Arizona law—or rejects a plea offer in favor of a trial—a right under the U.S. Constitution—the next plea offer will get "***substantially harsher***."

2.     In other words, as a matter of policy, the Maricopa County Attorney's Office (MCAO) punishes people simply for exercising their rights.

3.     MCAO openly admits on its website that the purpose of the policy is speed, not justice. MCAO's stated goal in EDC cases is to mitigate case backlogs "by resolving them as quickly as possible."

4.     To implement the policy, MCAO often issues this threat at the top of its first written plea offer:

> ***\*THE OFFER IS WITHDRAWN IF THE WITNESS PRELIMINARY HEARING IS SET OR WAIVED. THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA. \*NOTE: COUNTY ATTORNEY POLICY DICTATES THAT IF THE DEFENDANT REJECTS THIS OFFER, ANY SUBSEQUENT OFFER TENDERED WILL BE SUBSTANTIALLY HARSHER.***

5.     Sometimes the deputy county attorney (DCA) issues a different form with a similar threat, or informs defense attorneys of the policy via email. In most cases, the DCA reads the threat into the record, in front of a judge, at the EDC status conference.

6.     It does not matter what the charges are or what the accused person's criminal history is, if any. It does not matter if the person simply wants more time to investigate their case. It does not even matter if the person might be innocent. "County Attorney policy dictates" that DCAs will punish that person simply for exercising their rights.

7.     In this matter, Plaintiffs will refer to this policy as MCAO's Retaliation Policy.

8.     The Retaliation Policy is not an empty threat. DCAs routinely follow through in practice. Sometimes, people being prosecuted are granted continuances to consider their initial offers. However, those offers still get "substantially harsher" if the person refuses to

plead and instead requests a preliminary hearing—where, among other things, police witnesses are examined and a judge could decide that MCAO does not have probable cause to proceed.

9.     In other words, rather than prosecute only those cases where probable cause is clear, DCAs instead illegally coerce people to waive the probable cause determination entirely.

10.     Indeed, if the person simply rejects the first offer, or makes the DCA expend any additional time or resources on the case, or asks the DCA to turn over any discovery beyond a police report, the offer on the table is often pulled and replaced with one substantially harsher.

11.     EDC prosecutors are particularly averse to disclosing evidence. They typically provide nothing more than a police report prior to the preliminary hearing, even if they have other evidence on hand; they call this refusing to "open the file." Therefore, the people they prosecute must choose between receiving additional discovery after the preliminary hearing or being hit with a substantially harsher plea offer. The harsher offer could include years if not decades in prison and a lifetime of consequences including being barred from certain jobs and losing the right the vote.

12.     In addition, the Retaliation Policy effectively prevents people from securing their pretrial release through an adversarial bail review hearing, which would also take place at the preliminary hearing. This makes their situation inherently more coercive, being separated from their families, unable to work, and hindered from being able to assist in their own defense. Studies show that pretrial detention greatly increases the likelihood of pleading out.

13.     It is no surprise, then, that many people succumb to the Retaliation Policy, forego their rights, and plead out, rather than face a substantially harsher offer.

14.     The plaintiffs in this case include people like Michael Calhoun who are, at this very moment, staring down the barrel of the Retaliation Policy. They have been arrested, assigned to the EDCs by MCAO, and are currently considering an unconscionable

choice:  assert their rights, or receive a substantially harsher plea offer just for doing so.

15.     Others, like Plaintiff Samuel Luckey, have already been coerced out of their preliminary hearing. Mr. Luckey was arrested on drug and weapons charges based on the word of certain witnesses, yet the DCA on his case refused to turn over the identities of those witnesses—or any other evidence besides an initial, redacted police report. Mr. Luckey, who missed the birth of his daughter while detained pretrial, told MCAO and the judge that he felt "threatened" by the Retaliation Policy, and that all he wanted was more evidence and to present his case. MCAO refused.

16.     Eventually, Mr. Luckey succumbed to the pressure and waived his preliminary hearing in order to receive the information MCAO had all along.

17.     Plaintiffs also include Arizona Attorneys for Criminal Justice (AACJ), representing criminal defense attorneys who are denied the time and information required to meaningfully represent their clients because of the Retaliation Policy.

18.     The most important rule in the prosecutor's code of professional ethics is "to seek justice . . . not merely to convict." MCAO's Retaliation Policy is surgically designed to do the opposite. Accordingly, Plaintiffs respectfully seek class certification and injunctive relief to end it.

**JURISDICTION AND VENUE**

19.     This Court has subject-matter jurisdiction over this action pursuant to 42 U.S.C. § 1983 (civil rights action) and 28 U.S.C. § 1331 (federal question).

20.     This Court may grant relief under 28 U.S.C. §§ 2201-02 (declaratory relief); Federal Rules of Civil Procedure 65 (injunctive relief) and 23 (class action); and the Sixth and Fourteenth Amendments to the U.S. Constitution.

21.     Venue is proper in the federal District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' and class members claims occurred in this district.

## **PARTIES**

22.     Samuel Luckey is a 34-year-old Black man currently being prosecuted by Defendant. His case began in the EDC, where he was denied any discovery except a redacted police report and threatened with a harsher plea offer if he affirmed his right to a preliminary hearing guaranteed under the Arizona Constitution and Arizona law. He has now succumbed to Defendant's pressure, waived his preliminary hearing, and is awaiting trial.

23.     Mr. Luckey missed the birth of his daughter because he was in jail on this arrest, unable to afford his $10,000 bail.

24.     Mr. Luckey lives in Phoenix, Arizona.

25.     He is suing on behalf of himself and all current and future EDC defendants subject to the Retaliation Policy who have already waived their preliminary hearings.

26.     Michael Calhoun is a 61-year-old male currently being prosecuted by Defendant.  Mr. Calhoun's case is in the EDC, where Defendant is offering him a plea of 9.25 years in prison for allegedly selling $20 worth of drugs. He has a history of drug convictions, most for simple possession.   He has never been arrested for, much less convicted of, a crime of violence. Yet, despite Defendant's public claims that it seeks to divert people like Mr. Calhoun from the criminal justice system and get them treatment, Defendant is offering Mr. Calhoun only prison time and threatening an even harsher offer if he refuses.

27.     Mr. Calhoun lives in Phoenix, Arizona.

28.     He is suing on behalf of himself and all current and future EDC defendants subject to the Retaliation Policy who are currently deciding whether to waive their preliminary hearing and/or reject their initial EDC plea offer.

29.     Plaintiff Arizona Attorneys for Criminal Justice is a non-profit organization of attorneys who represent indigent criminal defendants across Arizona, including the Maricopa County EDCs. AACJ believes that the Retaliation Policy makes it difficult for its members to provide adequate counsel and has diverted resources to train its members and

other defense attorneys on navigating EDC cases in light of the policy.

30. Defendant Allister Adel is the elected County Attorney for Maricopa County, Arizona. She is the official policymaker for the Maricopa County Attorney's Office and is sued in her official capacity.

## FACTUAL ALLEGATIONS

*The EDCs Were Created to Help Defendants Avoid Convictions.*

*MCAO Uses Them to Coerce Convictions Instead.*

31. In 1996, Arizona passed Proposition 200, which lowered penalties for drug possession, including prohibiting jail time for first-time, possession-only defendants. *See* A.R.S. § 13-901.01 et seq. In turn, Maricopa County created the "Expedited Drug Courts," which initially went by several different names: Early Disposition Courts (EDC); Regional Court Centers (RCC); and the Southeastern Facility (SEF). EDC focused on drug cases, while RCC focused on lower-level felonies. SEF did both for the Mesa, Arizona area. Now they have been merged into a single system called the EDCs.

32. The original stated purpose of these courts was to "provide incentives to early pleas and earlier treatment."[1] To this day, the Maricopa County Courts website claims that "cases filed in EDC involve victimless charges of possession of illegal drugs for personal use and/or paraphernalia. Most of the cases resolved in EDC are diverted into a drug treatment program."[2]

33. This is false. Maricopa County Court data from October 2018, for example, indicates that only 8% of EDC cases resulted in diversion. Plaintiffs' counsel's preliminary review of MCAO's own data, collected via a public records request, indicates that, from

---

[1] Specialized Courts: Early Disposition Court, THE JUDICIAL BRANCH OF ARIZONA, MARICOPA COUNTY, https://superiorcourt.maricopa.gov/criminal/specialized-courts/#:~:text=Early%20Disposition%20Court,to%20as%20Expedited%20Drug%20Court (last updated Aug. 2, 2019, 1:44 PM).

[2] *Department Information: Early Disposition Court*, THE JUDICIAL BRANCH OF ARIZONA, MARICOPA COUNTY, https://superiorcourt.maricopa.gov/criminal/department-information/ (last updated July 9, 2019, 5:04 PM).

1   January 2017 to January 2021, the number was even lower: 6.7%.

2   34.   MCAO is also filtering an increasing number and variety of cases through the

3   EDC system—presumably because the office has had success quickly pleading the cases

4   out and clinching easy, low-cost convictions. Indeed, during the COVID-19 pandemic,

5   grand juries were closed and even more cases were subject to EDC processes.

6   35.   Counsel's preliminary review of MCAO data indicates that MCAO sent

7   roughly 32,000 cases to the EDCs between January 2017 and January 2021. From 2019 to

8   2021, that represented roughly 40% of all criminal cases. And at least 30% of those cases

9   involved no drug-related charges whatsoever, much less only possession and paraphernalia

10   charges.

11   36.   Curiously, as MCAO sends more and more cases through the EDCs—and

12   extracts more and more constitutionally suspect felony convictions—it takes pains to draw

13   attention away from that reality. In its 2016 Annual Report, MCAO mentions the EDCs

14   only once, vaguely describing it as a system that "*can include* pretrial resolutions and

15   preliminary hearings." The report does not mention the Retaliation Policy, which punishes

16   people for seeking those very hearings.

17   37.   By 2020, MCAO was sending significantly more cases to the EDCs, but the

18   Annual Report for that year doesn't mention the EDCs at all. In fact, in the report, MCAO

19   congratulates itself for putting certain of its plea policies online—yet they do not include

20   the Retaliation Policy.

21   38.   The Retaliation Policy appears unique to the EDCs. On information and

22   belief, MCAO does not employ it outside of cases that begin in the EDCs, at least not in

23   this overt manner.

24   39.   In fact, the Retaliation Policy contradicts elements of MCAO's more

25   generalized plea-bargaining policies. For example, Policy 7.1, titled Plea Agreements:

26   General Guidance, Timing of Offers, and Settlement Negotiations, states that "each DCA

27   is expected to critically weigh the circumstances of each case to determine the appropriate

28   initial offer. DCAs should engage in meaningful negotiations which includes discussing the

case with defense counsel to learn as much as possible about the defendant. . . . *[I]t is not possible to handle every charge or every circumstance identically.*"

40.     The Retaliation Policy does precisely the opposite: it treats every case "identically," forecloses "meaningful negotiation," and determines plea offers without regard to "the circumstances of each case," while learning next to nothing about the defendant.

*MCAO Uses its Retaliation Policy to Coerce Quick, Low-Cost Pleas in the EDCs.*

41.     When a person is arrested and booked into jail in Maricopa County, they must be taken before a magistrate within twenty-four hours for an initial appearance from jail. Those not arrested are summonsed for their initial appearance.

42.     When a person is arrested and held in custody on a bond or non-bondable, the magistrate sets two dates: (1) a status conference about six days after the initial appearance, and (2) a preliminary hearing about nine days after the initial appearance. If the defendant is not held in custody, the status conference is set out approximately fourteen days, and the preliminary hearing date is set out approximately eighteen days.[3]

43.     At the initial appearance, the magistrate also makes several critical determinations, including whether the defendant qualifies for a public defender and whether they should be released or detained pending trial. Detention can and often does result from unaffordable cash bail.

44.     The magistrate makes the release decision with nothing more than a "probable cause statement" from the police—normally only a few paragraphs long, and told only from the police's perspective. At the initial appearance, indigent people have not yet been appointed a public defender to challenge the probable cause statement or examine the officers who made it. DCAs do not attend.

---

[3] The timing of these settings are because, under Ariz. R. Crim. Pro. 5.1, "[a] preliminary hearing must commence before a magistrate no later than 10 days after the defendant's initial appearance if the defendant is in custody, or no later than 20 days after the defendant's initial appearance if the defendant is not in custody."

45.     Notably, a meaningful, adversarial bail review often does not take place. The initial appearance is not structured that way and the preliminary hearing, which could include a legally compliant bail review, often never happens because of the Retaliation Policy.

46.     Avoiding an adversarial detention review while the Retaliation Policy hangs over a person's head is a vital feature of how MCAO achieves quick pleas. Studies show that being detained without bail significantly increases the likelihood of pleading out, and pleading out quickly. Pretrial detention also makes it more difficult for someone to participate in their own defense.[4]

47.     Following the initial appearance, those who cannot afford their own attorney are typically appointed a public defender the day before the status conference. At that time, the prosecutor typically sends the accused person the police report and an initial plea offer, and that is all.

48.     The plea offer often has the following threat emblazoned on it:

> *THE OFFER IS WITHDRAWN IF THE WITNESS PRELIMINARY HEARING IS SET OR WAIVED. THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA. *NOTE: COUNTY ATTORNEY POLICY DICTATES THAT IF THE DEFENDANT REJECTS THIS OFFER, ANY SUBSEQUENT OFFER TENDERED WILL BE SUBSTANTIALLY HARSHER.

49.     Other forms contain a similar threat:

> This offer is contingent upon victim input. This offer will be withdrawn and no longer available after today's hearing date. This offer is withdrawn if the preliminary hearing is affirmed or waived. The offer may be changed or revoked at any time before the court accepts the plea.
> **NOTE: County Attorney policy dictates that if the defendant rejects this offer, any subsequent offer tendered will be substantially harsher.**

---

[4] *See* Nick Petersen, *Do Detainees Plead Guilty Faster? A Survival Analysis of Pretrial Detention and the Timing of Guilty Pleas*, 31(7) CRIM. JUST. POL'Y REV. 1015, 1025 (2019) (pretrial detainees plead out 2.86 times faster than released defendants); Will Dobbie, Jacob Goldin, & Crystal S. Yang, *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AM. ECON. REV. 201, 203 (2018).

50.    DCAs also confirm the policy in emails to public defenders:

**From:** ▉▉▉▉▉▉▉▉▉▉
**Sent:** Tuesday, June 22, 2021 7:42 AM
**To:** Edie Lucero (OPD)
**Subject:** RE: Offer: State v. ▉▉▉▉▉▉▉

Hi Edie,

Yes, the policy will apply here as well.

Best,

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**From:** Edie Lucero (OPD) ▉▉▉▉▉▉
**Sent:** Monday, June 21, 2021 4:35 PM
**To:** ▉▉▉▉▉▉▉▉▉▉
**Subject:** RE: Offer: State v. ▉▉▉▉

Hello ▉▉▉▉

If ▉▉▉▉ affirms her PH, will she be subject to MCAO's policy that the next plea will be "substantially harsher," if she affirms?

Please let me know, thanks, Edie

Zoom

51.    In the days between the initial appearance and the first status conference, prosecutors typically refuse to provide accused people and their counsel any additional information about the case, like witness statements, body camera footage, or drug test results.  This is true even if they have the information in their possession and even if that information could exonerate the person, eliminate one or more charges, or mitigate the sentence.

52.    Although Arizona's ethical guidelines require prosecutors to make "timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with

sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor," it is MCAO's common practice to refuse to provide any discovery at all, other than a single police report, until after the criminal defendant has made a decision on the EDC offer, and sometimes longer.

53.     And because Arizona's criminal discovery rules require discovery to be provided at the preliminary hearing or arraignment in Superior Court, pressuring defendants to waive the preliminary hearing and plead guilty allows the prosecutor to claim they need not provide any discovery at all.

54.     By pressuring people to plead guilty in the EDCs, MCAO also does an end-run around Arizona Rule of Criminal Procedure 15.8, which requires DCAs to provide discovery at the time a plea offer is made in Superior Court. It also provides for sanctions under certain circumstances if DCAs do not give a person 30 days after the offer is made to consider it. But because hearings in the EDC occur prior to the filing of "an indictment or information in the superior court," Rule 15.8's protections do not apply to EDC.

55.     Upon information and belief, the distinction that MCAO makes between EDC and the Superior Court is largely pretextual, particularly to the defendant and defense attorney. EDC appearances still take place in courtrooms (or, during the pandemic, over video). Magistrate judges make binding decisions. And, most importantly, a coerced plea still ends the case and results in conviction.

56.     However, MCAO operates the EDCs as a Constitution-free zone, where prosecutors retain all their powers of investigation and conviction, but criminal defendants are effectively prohibited from asserting rights under state and federal law.

57.     Given the lack of time to prepare for the status conference, the DCAs' refusal to provide discovery, defense attorneys' own constitutional ethical obligations to provide effective assistance, and, most importantly, the Retaliation Policy hanging over their clients' heads, criminal defendants and their attorneys are often forced to make an exceptionally difficult and unnecessary choice: accept a virtually blind plea deal or seek a continuance that delays their client's case. For those who are detained, this extends their

1   time behind bars.

2       58.     If and when the parties appear at the status conference, sometimes after one

3   or more continuances, this is typically the latest date the DCA will allow the criminal

4   defendant to waive their right to a preliminary hearing. Waiver could result in an acceptance

5   of the plea at the status conference itself or continuation toward trial while negotiations

6   continue under the then-current plea offer.

7       59.     If the preliminary hearing is not waived—colloquially called "affirming the

8   prelim"—the DCA then typically makes what it calls a *Donald* advisement on the record at

9   the status conference. The *Donald* advisement is named after an Arizona case that requires

10  notice to the criminal defendant of the maximum possible prison sentence.[5] However,

11  MCAO also uses the *Donald* advisement to repeat the Retaliation Policy: that the criminal

12  defendant has chosen not to waive their right to a preliminary hearing, and therefore MCAO

13  will pull the current offer and any subsequent offer will be substantially harsher.

14      60.     MCAO openly acknowledges that the Retaliation Policy exists to process

15  cases as quickly as possible and spare DCAs the inconvenience of working up cases. As

16  one DCA phrased it in an email: "The purpose of EDC is to facilitate speedy resolutions . .

17  . because once the case leaves EDC, MCAO must expend significant resources for trial

18  preparation."

19

20  From: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
    Sent: Monday, May 24, 2021 9:36 AM
21  To: ▉▉▉▉▉▉▉▉
    Subject: RE: Offer: State v. ▉▉▉▉▉▉▉▉

22  Hi Edie,

23  The purpose of EDC is to facilitate speedy resolutions. An EDC plea is the most lenient offer a defendant will get because
24  once the case leaves EDC, MCAO must expend significant resources for trial preparations.

    Best,
25

26

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [5] *State v. Donald*, 10 P.3d 1193 (Ariz. App. 1st Div. 2000).

61.     In another email exchange, the DCA explains that providing body worn camera footage—to which the DCA clearly has access—is "inconsistent with the goal of EDC." Further, "[i]f we had to collect, review, and produce BWC in every case, *or even the subset of cases where the Defendant thought there was a legal or factual defense*, given the high volume of cases in EDC, it would bog the entire system down and swamp the law enforcement agencies."

From: ███████████████████
Sent: Tuesday, May 4, 2021 3:03 PM
To: Edie Lucero (OPD ████████████████
Subject: RE: State v. ████████████

Edie,

I see we have a status conference in this case tomorrow and recall that I did not yet respond to your email below. Providing BWC is inconsistent with the goal of EDC, which is to promote the early resolution of felony cases. If we had to collect, review, and produce BWC in every case, or even the subset of cases where the Defendant thought there was a legal or factual defense, given the high volume of cases in EDC, it would bog the entire system down and swamp the law enforcement agencies. Plus, it makes no sense to engage in discovery where the State has offered the Defendant diversion. We've sent you the motion to suspend packet. If the Defendant would like to avail ████ of the diversion option, you can return that paperwork to our diversion department. If not, the alternative offer in EDC would be to PDP 6 open and a stipulation to supervised probation, or she can straight waive or affirm.

Just let me know how she'd like to proceed.

Sincerely yours,

*Losing the Right to a Preliminary Hearing is Significant for EDC Defendants.*

62.     The Arizona Constitution makes preliminary hearings mandatory in felony cases that proceed by information, like those in EDC. Article 2. Section 30 states that: "No person shall be prosecuted for a felony by information without having had a preliminary examination before a magistrate or having waived such preliminary examination."

63.     Arizona Rule of Criminal Procedure 5.1 implements this mandate: "A defendant has a right to a preliminary hearing if charged in a complaint with a felony."[6]

---

[6] Waiver of a preliminary hearing requires several factors to be met. The waiver must be in writing and it must be signed by the defendant, defense counsel, and the State. Ariz. R. Crim. P. Rule 5.1. Only after these substantive requirements are met can the prosecution continue their case against a defendant who has not been afforded a preliminary hearing.

64.     Arizona Rule of Criminal Procedure 5.3 further requires that the magistrate at the preliminary hearing "must determine and state for the record whether the State's case establishes probable cause."

65.     In addition, the Arizona Supreme Court has held that, because an initial appearance "provides no opportunity for a defendant to present evidence or make any argument regarding the law or evidence," it is "ill-suited to support conclusive findings affecting a defendant's liberty," and instead "serve[s] the limited function of providing some check on the ability of the state to hold a defendant . . . [but only] until either a preliminary hearing or grand jury proceeding is convened."[7]

66.     The Arizona Supreme Court has also held that the framers likely intended the preliminary hearing to act as "a shield to the citizen against the unwarranted zeal of prosecuting officers."[8]

67.     Therefore, Arizona law going back over a century makes clear that a person charged with a felony by information or complaint is entitled to a preliminary hearing, and for good reason. Yet MCAO makes it a matter of policy to deprive EDC defendants of that right.

68.     As noted above, the primary purpose of the preliminary hearing is to determine whether the state has probable cause to continue prosecuting someone, given that a grand jury has not served that function. If the magistrate at the preliminary hearing finds that MCAO has not established probable cause, the case is over.

69.     And even if MCAO establishes probable cause, the preliminary hearing can reveal police misconduct, unreliable testimony, or infirmities in the evidence-gathering process, which could lead to a later suppression motion.

70.     Further—and perhaps most importantly—after a preliminary hearing, when the case is bound over to Superior Court for trial, MCAO is required to begin providing

---

[7] *Segura v. Cunanan*, 219 Ariz. 228, 238–39, 196 P.3d 831, 841–42 (Ct. App. 2008).

[8] *Quen Guey v. State*, 20 Ariz. 363, 365 (1919).

1   more evidence. On information and belief, MCAO calls this being forced to "open the file."

2   As indicated by the DCA emails above, MCAO is generally loathe to do so.

3       71.   In sum, the preliminary hearing is an essential protection for people facing

4   criminal prosecution. It can end or undermine MCAO's case, or at least force DCAs to turn

5   over discovery and endure the work of preparing for trial. Yet, rather than respect the

6   preliminary hearing, MCAO strictly enforces the Retaliation Policy in order to coerce pleas

7   before cases ever get to that stage—much less all the way to trial.

8       *EDC Defendants and Their Attorneys Confirm that this Unconstitutional Retaliation*

9       *Actually Occurs—and it Harms Them.*

10      72.   MCAO's Retaliation Policy harms real people. The following are a handful

11  of examples, including the plaintiffs in this case.

12      73.   *Plaintiff Samuel Luckey*. Mr. Luckey is a 34-year-old Black man who recently

13  welcomed the birth of his daughter. Police arrested him for drug and weapons charges after

14  two witnesses implicated him during an unrelated traffic stop.

15      74.   Based on these two hearsay accounts, MCAO charged Mr. Luckey with two

16  counts of sale, one count for possession of drug paraphernalia, and one count for possession

17  of a firearm. Neither the police nor the witnesses ever personally viewed him selling drugs

18  or carrying a weapon.

19      75.   MCAO pushed Mr. Luckey's case quickly through the EDCs and denied any

20  discovery except a redacted police report. MCAO offered only a plea deal including felony

21  convictions and a prison term from two to five years. Per its Retaliation Policy, MCAO also

22  threatened Mr. Luckey with a harsher plea offer if he rejected the deal and affirmed his right

23  to a preliminary hearing.

24      76.   During his status conference, Mr. Luckey told the EDC prosecutor and judge

25  that he felt "threatened" by the Retaliation Policy. He said he "had no choice" but to waive

26  his preliminary hearing because prosecutors were not disclosing any additional evidence

27  for him to make an informed decision. He said he was "damned if I do, damned if I don't."

28      77.   Despite these distressed statements, the DCA covering the hearing said

nothing. The judge accepted the waiver.

78.     In addition to being coerced out of his rights, Mr. Luckey has already spent three long months in pretrial detention during a pandemic, missed the birth of his daughter, and lost both his food stamps and unemployment insurance.

79.     *Plaintiff Michael Calhoun*. Michael Calhoun is a 61-year-old Black man with substance use disorder. He has a long history of drug convictions, mostly for possession of drugs and paraphernalia. He has never been convicted of or even arrested for a violent offense. He is also an artist and a father who has lived in the Phoenix area for decades.

80.     In September 2019, Mr. Calhoun was arrested for selling $20 worth of methamphetamine to an undercover officer. Mr. Calhoun was arrested, released, and heard nothing from the courts for roughly eighteen months.

81.     In April 2021, MCAO decided to not only revive the case in the EDCs, but offer Mr. Calhoun nothing lower than 9.25 years in prison for his $20 drug sale. Moreover, the new DCA on the case confirmed that, if Mr. Calhoun affirmed his preliminary hearing and proceeded toward trial instead of taking that draconian deal, the next offer would get substantially harsher.

82.     Despite MCAO's public proclamations that it uses the EDCs to divert drug offenders away from incarceration and towards treatment, and despite the fact that Mr. Calhoun is clearly a candidate for such treatment, MCAO has not offered diversion in this case. Instead, it is using prior drug convictions—charges for which MCAO did not offer diversion or treatment either—to justify its current prison-only offer.

83.     Mr. Calhoun is currently deciding whether to assert his right to a preliminary hearing and trial, or whether to take a nine-year sentence for selling $20 worth of drugs. Either way, he is terrified of dying in prison.

84.     *Deniece Pierce*. Deniece Pierce is a 51-year-old woman who had no criminal record before finding herself in the EDCs. She stole roughly $2,000 from her father by writing a series of false checks out of his account. When arrested, she admitted to it and, through her lawyer, simply asked for time to find a job to pay back the money.

85.     Instead, MCAO pushed her case quickly through EDC, offering a plea that required a felony conviction. They also ratcheted up the stakes by charging each check as a separate offense, many of which contained separate mandatory minimum sentences, even though it was clear that Ms. Pierce's wrongdoing was all part of a single misguided scheme. This stacking of charges created an extreme "trial penalty"—the difference between her exposure at trial (79.25 years in prison) and the comparatively "lenient" plea offer from MCAO (four years of probation and lifetime felony conviction on her record).[9]

86.     Ms. Pierce did not understand why MCAO was pushing the case so quickly and aggressively. She was deeply afraid of a potentially decades-long prison sentence, as well as receiving a substantially harsher offer if she asserted her rights. At one point, her attorney had to continue a case setting because she had a panic attack outside the courthouse.

87.     Her attorney told her the offer was unfair and she could affirm her preliminary hearing while continuing to try to pay back the money.

88.     Ms. Pierce instead succumbed to the Retaliation Policy and took the deal.

89.     Since her conviction, Ms. Pierce has started her own cleaning company. She says she loses many potential clients because her felony conviction appears on background checks.

90.     *Levonta Barker*. Last year, Levonta Barker was minding his own business at a 7-Eleven in Phoenix when police suddenly drove up to him in the parking lot, threw him to the ground, and arrested him. He had no idea why. At some point, the police brought two people who said they had been robbed to the parking lot for a one-person lineup. All the victims could confirm was that their assailant was wearing a bandana, and so was Mr. Barker.

91.     Based on these "identifications," MCAO charged Mr. Barker with two counts each of aggravated assault and kidnapping. The DCA sent him a plea offer of 7.5 years in

---

[9] The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It, NAT'L ASS'N OF CRIM. DEF. LAW. (July 10, 2018), https://www.nacdl.org/Document/TrialPenaltySixthAmendmentRighttoTrialNearExtinct.

1   prison, followed by probation under "gang terms." Under the Retaliation Policy, that offer

2   would get substantially harsher if Mr. Barker rejected the offer and/or affirmed his

3   preliminary hearing.

4       92.    But MCAO had not even investigated the case yet. Luckily, Mr. Barker's

5   attorney, Chris Simonds, had done so. Mr. Simonds independently found Mr. Barker's

6   booking photo and realized Mr. Barker was wearing a purple shirt at the time of his arrest;

7   one of the police reports indicated the perpetrator was wearing a black one.

8       93.    Eventually, MCAO dropped the charges against Mr. Barker, but not before

9   he had spent roughly a month in a COVID-infested jail, lost his job, lost an apartment he

10  was hoping to begin renting, missed his oldest son's birthday, and missed Christmas with

11  his family.

12      94.    Worse yet, MCAO was clearly willing to convict an innocent man before

13  doing any investigation. Indeed, they were pressuring him to take a plea deal or face a

14  "substantially harsher" offer if he asserted his rights. If Mr. Barker had not waited it out in

15  jail—and many people cannot—MCAO would have secured the wrongful conviction, and

16  Mr. Barker would still be behind bars today.

17      95.    *AACJ and Maricopa County Public Defenders.* Defense attorneys in

18  Maricopa County confirm that this is a systemic problem. The Retaliation Policy has

19  significantly hindered these attorneys' ability to represent their clients.

20      96.    Plaintiff AACJ is a non-profit membership organization whose mission

21  includes supporting criminal defense attorneys and, by extension, their clients. Its members

22  litigate in the EDCs every day. AACJ is deeply concerned that MCAO's Retaliation Policy

23  places its members in compromising ethical positions by forcing them to advise clients

24  without the necessary time or discovery. In fact, AACJ has sponsored at least three trainings

25  on practicing in the EDCs, diverting its limited funds to address this problem. One of those

26  trainings was titled, "Effective and Ethical Representation in Early Disposition Courts,"

27  which, in part, discussed the ethical dilemma imposed on criminal defense attorneys,

28  including AACJ members, practicing in the EDCs.

97.    Edith Lucero is a Maricopa County deputy public defender (DPD) and a former Arizona administrative law judge and federal Department of Homeland Security official. She has spent 11 years in the Public Defender's Office between the trial and appellate groups. She represents Plaintiff Michael Calhoun, represented Plaintiff Samuel Luckey before he moved to the trial court, and has represented hundreds of other people in the EDCs. She believes the Retaliation Policy, in combination with MCAO's refusal to provide discovery while her clients are considering it, coerces her clients and leaves them believing the system is unfair. This harms her clients and her attorney-client relationship with them.

98.    Chris Simonds represented Deniece Pierce, Levonta Barker, and thousands of other people in the EDCs. Mr. Simonds believes that the Retaliation Policy is cruel, vindictive, and makes it difficult to ethically represent his clients. He recently left the Maricopa County Public Defender in part because the policy.

99.    Gary Kula, the head of he Office of Public Defender, confirms that EDC cases are swallowing a greater and greater portion of his office's resources. He now devotes 34 full-time deputy public defenders and 12 support staff to these courts. At any given time, there are approximately 3,500 active cases pending there.

100.    Coercing felony pleas via the Retaliation Policy has serious consequences. In Arizona, a felony conviction bars people from public housing and can cost them their driver's license and professional credentials—all of which makes it harder to earn a living and contribute taxes post-conviction. A felony conviction also bars people from jury service and negates their right to vote for *four years*—and, for anyone with more than one felony conviction, restoration of rights is extraordinarily difficult.

101.    In short, MCAO's Retaliation Policy may be a way for the office to secure quick, painless convictions. But for the thousands of people on the other side of these cases, the pain is real, and it can last a lifetime.

1

## CLASS ACTION ALLEGATIONS

2     102.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

3     Procedure on behalf of themselves and classes of similarly situated individuals.

4     103.   The action contains two proposed classes:

5     (1) All current and future people whom the MCAO has charged and assigned to

6         the EDCs and who are subject to MCAO's blanket policy, practice, or custom

7         of making or threatening to make plea offers harsher in response to people

8         exercising their right to a preliminary hearing and/or trial, but who have not

9         yet made the decision to affirm or waive their preliminary hearing, or reject

10        or accept their initial plea offer (the "Pre-Waiver Class"); and

11    (2) All current and future people whom the MCAO has charged and assigned to

12        Maricopa County's EDCs, and who are subject to MCAO's blanket policy,

13        practice, or custom of making or threatening to make plea offers harsher in

14        response to people exercising their right to a preliminary hearing and/or trial,

15        but who have waived their preliminary and/or rejected their initial plea offer

16        (the "Post-Waiver Class").

17    104.   Plaintiff Michael Calhoun seeks to represent the Pre-Waiver Class. Plaintiff

18    Sam Luckey seeks to represent the Post-Waiver Class.

19    105.   This action has been brought, and may properly be maintained, as a class

20    action under federal law. Both classes independently satisfy the numerosity, commonality,

21    typicality, and adequacy requirements for maintaining a class action under Federal Rule of

22    Civil Procedure 23(a), and both independently satisfy the requirements for certification

23    under Rule 23(b)(2) or, in the alternative, 23(b)(1).

24    106.   *Numerosity*. Upon information and belief, there are at least 40 current people

25    in both classes.  Counsel's preliminary review of MCAO's own data, collected via a public

26    records request, indicates that MCAO sent roughly 32,000 cases to the EDCs between

27    January 2017 and January 2021. The head of the Maricopa County Office of Public

28    Defender estimates there are roughly 3,500 active cases pending in EDC on any given day.

107.   Joinder is impracticable for both classes because (1) the class members are numerous, (2) delay will cause serious harms, including continued coerced convictions; (3) the classes are inherently transitory and include future members, (4) many of the class members are incarcerated, limiting their ability to communicate with counsel and institute individual lawsuits, and (5) the very nature of the Retaliation Policy makes the strength-in-numbers associated with class certification appropriate.

108.   *Commonality*. Certain common questions of law and fact exist across both of the proposed classes. Common questions of fact include whether MCAO indeed maintains the Retaliation Policy and how the office carries it out. A common question of law is whether the Retaliation Policy violates people's Sixth and Fourteenth Amendment rights. These common questions of law and fact are amenable to common answers, including that eliminating the Retaliation Policy will cure the constitutional violations.

109.   For the Pre-Waiver Class, common questions include how the Retaliation Policy coerces people into foregoing their rights. For the Post-Waiver Class, common questions include if and when MCAO delivers discovery even after a preliminary hearing waiver.

110.   *Typicality*. Plaintiffs' claims in both classes are typical of and reasonably co-extensive with their respective class members' claims.

111.   *Adequacy*. Plaintiffs in both classes have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of their respective classes.

112.   Plaintiffs in both classes have no interests adverse to the interests of the proposed respective classes.

113.   Plaintiffs in both classes retained pro bono counsel with experience and success in the prosecution of civil rights litigation, including class action litigation and litigation alleging violations of trial rights.

114.   Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

115.   *Rule 23(b)(2)*. Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief. Plaintiffs therefore seek class certification under Rule 23(b)(2).

116.   *Rule 23(b)1)*. In the alternative, Rule 23(b)(1) is satisfied because pursuing separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members in both classes that would establish incompatible standards of conduct for the party opposing the proposed classes.

## CLAIMS FOR RELIEF

### Claim One

### *Prosecutorial Vindictiveness*

### *in Violation of the Fourteenth Amendment to the United States Constitution*

117.   The Due Process Clause of the Fourteenth Amendment prohibits prosecutors from acting with vindictiveness toward people accused of crimes.

118.   Prosecutors act with prohibited vindictiveness when they punish people in retaliation for exercising their basic trial rights.

119.   Defendant maintains and executes an official, blanket policy, practice, or custom of making plea offers in the EDCs "substantially harsher" in response to people exercising their right to a preliminary hearing and/or trial (hereafter, "Retaliation Policy").

120.   Defendant expresses the Retaliation Policy on EDC plea offer forms, in emails with defense attorneys, and on the record during status conferences.

121.   Defendant routinely carries out the Retaliation Policy, punishing people for exercising their basic trial rights.

122.   The Retaliation Policy is actually vindictive because the Retaliation Policy's existence and execution is direct evidence of an expressed hostility or threat to criminal defendants in EDC for exercising their statutory, procedural, or constitutional rights.

123.   The Retaliation Policy is also presumptively vindictive because it poses a realistic likelihood of vindictiveness.

124.    Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Fourteenth Amendment rights.

125.    Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

<u>**Claim Two**</u>

***Excessive Burden on the Right to Trial***

***in Violation of the Sixth Amendment to the United States Constitution***

126.     The government may not promulgate a blanket criminal policy that contains higher penalties for asserting trial rights and lower penalties for pleading guilty.

127.    Whatever the government's goals in creating such a policy, those goals cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. If a criminal policy has "no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them," the Supreme Court has made clear that the policy is "patently unconstitutional."

128.    Defendant maintains and executes such a policy:  The Retaliation Policy.

129.    Defendant admits that the purpose and intended effect of the Retaliation Policy is to penalize those who choose to exercise their trial rights.

130.    Therefore, whatever Defendant's stated goals for the Retaliation Policy, it is patently unconstitutional. Specifically, it violates the Sixth Amendment.

131.    Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Sixth Amendment rights.

132.    Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

## Claim Three

### *Deprivation of a State-Created Liberty Interest*

### *in Violation of the Fourteenth Amendment to the United States Constitution*

133.   The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving individuals of "life, liberty, or property" without due process of the law. Liberty interests protected by the Fourteenth Amendment include interests that are created by state law.

134.   Article 2. Section 30. of the Arizona State Constitution mandates that a person who is prosecuted by information for a felony is entitled to a preliminary hearing.

135.   Arizona Rule of Criminal Procedure 5.1 implements this mandate by stating that a person has a "right" to a preliminary hearing. Arizona Rule of Criminal Procedure Rule 5.3 further requires that the magistrate at the preliminary hearing "must determine and state for the record whether the State's case establishes probable cause."

136.   By using mandatory language and restraining prosecutorial discretion in this way, Arizona state law creates a federally protected liberty interest in a person's right to a preliminary hearing including a probable cause determination.

137.   Defendant's Retaliation Policy illegally has coerced or will coerce Plaintiffs and putative class members out of this federally protected liberty interest.

138.   Defendant's Retaliation Policy is unique and atypical in comparison to its general plea-bargaining policy, which includes the requirements that "the assigned DCA must consider all relevant facts and circumstances known about the offense and defendant" and "DCAs should engage in meaningful negotiations."

139.   Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Fourteenth Amendment rights.

140.   Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

141.    Certify this action as a class action and appoint named Plaintiffs as class representatives and the undersigned counsel as class counsel;

142.    Issue a judgment declaring that Defendant's blanket policy, practice, or custom of making plea offers in the EDCs "substantially harsher" in response to people exercising their right to a preliminary hearing and/or trial violates the Fourteenth Amendment;

143.    Issue a judgment declaring that Defendant's blanket policy, practice, or custom of making plea offers in the EDCs "substantially harsher" in response to people exercising their right to a preliminary hearing and/or trial violates the Sixth Amendment;

144.    As to both the Pre-Waiver Class and the Post-Waiver Class, issue a permanent injunction prohibiting Defendant from making or threatening to make plea offers in the EDCs "substantially harsher" in response to people exercising their right to a preliminary hearing and/or trial;

145.    As to the Post-Waiver Class, issue a permanent injunction prohibiting Defendant from (1) asserting the preliminary-hearing waiver or plea agreement itself as a basis for opposing any class member's attempt to withdraw their preliminary-hearing waiver or plea because it was coerced by Defendant's policy, practice, or custom of making or threatening to make plea offers in the EDCs "substantially harsher" in response to people exercising their right to a preliminary hearing and/or trial, and (2) retaliating against any class member for seeking or winning such a withdrawal;

146.    Grant Plaintiffs their reasonable attorneys' fees and expenses pursuant to 28 U.S.C. § 2412, 42 U.S.C. §§ 1988, and other applicable law; and

147.    Grant all further relief as this Court deems just and proper.

1

2

DATED: July 7, 2021

Respectfully submitted,

*/s/ Jared G. Keenan*

3

4

5

6

7

8

9

Jared G. Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org

10

11

12

13

14

Somil Trivedi (*pro hac vice application forthcoming)*
American Civil Liberties Union
Foundation
Criminal Law Reform Project
915 15th St., NW
Washington, DC 20005
Telephone: (202) 715-0802
strivedi@aclu.org

15

16

17

18

19

20

21

22

23

24

25

26

27

28