Somil Trivedi (*pro hac vice*)
American Civil Liberties Union Foundation
Criminal Law Reform Project
915 15th St., NW
Washington, DC 20005
Telephone: (202) 715-0802
strivedi@aclu.org

Jared G. Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org

***Attorneys for Plaintiffs***

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Samuel Luckey and Aaron Dromiack, on behalf of themselves and those similarly situated, and<br><br>Arizona Attorneys for Criminal Justice,<br><br>Plaintiffs,<br>v.<br>Allister Adel, in her official capacity as County Attorney for Maricopa County<br><br>Defendant. | No. CV21-01168-PHX-GMS (ESW)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1.      In Maricopa County's Early Disposition Courts (EDCs), prosecutors warn every single person they charge that if the person requests a preliminary hearing—a right under Arizona law—or rejects a plea offer in favor of a trial—a right under the U.S. Constitution—the next plea offer will get "presumptively harsher" or even "substantially harsher."

2.      In other words, as a matter of policy, the Maricopa County Attorney's Office (MCAO) punishes people simply for exercising their rights.

3.      MCAO openly admits on its website that the purpose of the policy is speed, not justice. MCAO's stated goal in EDC cases is to mitigate case backlogs "by resolving them as quickly as possible."

4.      To implement the policy, MCAO has often issued this threat at the top of its first written plea offer:

> *THE OFFER IS WITHDRAWN IF THE WITNESS PRELIMINARY HEARING IS SET OR WAIVED. THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA. *NOTE: COUNTY ATTORNEY POLICY DICTATES THAT IF THE DEFENDANT REJECTS THIS OFFER, ANY SUBSEQUENT OFFER TENDERED WILL BE SUBSTANTIALLY HARSHER.

5.      Sometimes the deputy county attorney (DCA) issues a different form with a similar threat or informs defense attorneys of the policy via email. In most cases, the DCA reads the threat into the record, in front of a judge, at the EDC status conference.

6.      It does not matter what the charges are or what the accused person's criminal history is, if any. It does not matter if the person simply wants more time to investigate their case. It does not even matter if the person might be innocent. MCAO policy dictates that DCAs will punish that person simply for exercising their rights.

7.      In this matter, Plaintiffs will refer to this policy, practice, and custom as MCAO's Retaliation Policy.

8.      The Retaliation Policy is not an empty threat. DCAs routinely follow through in practice. Sometimes, people being prosecuted are granted continuances to consider their

initial offers. However, those offers still get presumptively harsher or even "substantially harsher" if the person refuses to plead and instead requests a preliminary hearing—where, among other things, police witnesses are examined and a judge could decide that MCAO does not have probable cause to proceed.

9.    In other words, rather than prosecute only those cases where probable cause is clear, DCAs illegally coerce people to waive the probable cause determination entirely.

10.    Indeed, if the accused person simply rejects the first offer, makes the DCA expend any additional time or resources on the case, or asks the DCA to turn over any discovery beyond a police report, the offer on the table is often pulled and replaced with a harsher one.

11.    EDC prosecutors are particularly averse to disclosing evidence. They typically provide nothing more than a police report prior to the preliminary hearing, even if they have other evidence on hand; they call this refusing to "open the file." Therefore, the people they prosecute must choose between accepting the initial plea offer with only the police report as evidence and being hit with a harsher or substantially harsher plea offer in exchange for additional discovery after the preliminary hearing. The harsher offer could include years if not decades in prison and a lifetime of consequences, including being barred from certain jobs and losing the right the vote.

12.    Moreover, despite a plea policy that purports to require that "the assigned DCA must consider all relevant facts and circumstances known about the offense," DCAs rarely, if ever, review all evidence available to them, including police body worn camera footage, before making plea offers in the EDCs.

13.    Recently, MCAO hired retired Judge Roland Steinle to conduct an internal investigation into MCAO's decision to falsely charge protesters as gang members. In his report, Judge Steinle recommended that MCAO, "set forth a new policy: If Body Wear [sic] Camera evidence is present in a case, no charges will be filed until the charging attorney has had an opportunity to review the BWC videos."[1] Such a recommendation is

---

[1] REVIEW OF MARICOPA COUNTY ATTORNEY'S OFFICE'S POLICY, PROCEDURES, &

only necessary where, in practice, DCAs refuse to review all available evidence before charging individuals with felony offenses and making plea offers in the EDCs.

14.    This practice of not reviewing—let alone disclosing—the entire investigative file and then threatening individuals with harsher sentences if they reject the initial plea offers or assert their rights makes it far more difficult for EDC defense attorneys to effectively represent their clients. The Retaliation Policy forces attorneys and their clients to make hurried decisions without full access to information.

15.    In addition, the Retaliation Policy effectively prevents people from securing their pretrial release through an adversarial bail review hearing, which would also take place at the preliminary hearing. This makes their situation inherently more coercive, being separated from their families, unable to work, and hindered from being able to assist in their own defense. Studies show that pretrial detention greatly increases the likelihood of pleading out.[2]

16.    It is no surprise, then, that many people succumb to the Retaliation Policy, forego their rights, and plead out, rather than face a harsher or substantially harsher offer.

17.    The plaintiffs in this case include people like Aaron Dromiack who are, at this very moment, staring down the barrel of the Retaliation Policy. They have been arrested, assigned to the EDCs by MCAO, and are currently considering an unconscionable choice:  assert their rights, or receive a harsher plea offer just for doing so.

18.    Others, like Plaintiff Samuel Luckey, have already been coerced into waiving their preliminary hearing. Mr. Luckey was arrested on drug and weapons charges based on the word of certain witnesses, yet the DCA on his case initially refused to turn

_____

ACTIONS INVOLVING THE PROTEST ARREST ON OCTOBER 17, 2020 69, Submitted by Roland J. Steinle (Aug. 6, 2021), *available at*: https://www.maricopacountyattorney.org/DocumentCenter/View/2057/Final-MCAO-Report-8621.

[2] RAM SUBRAMANIAN ET AL., INCARCERATION'S FRONT DOOR: THE MISUSE OF JAILS IN AMERICA 38 n. 121 (Vera Institute of Justice ed., 2015) (guilty pleas may be the fastest or only way for defendants held on low-level charges to get out of jail).

over the identities of those witnesses—or any other evidence besides an initial, redacted police report. Mr. Luckey, who missed the birth of his daughter while detained pretrial, told MCAO and the judge that he felt "threatened" by the Retaliation Policy, and that all he wanted was more evidence and to present his case. MCAO refused.

19.     Eventually, Mr. Luckey succumbed to the pressure and waived his preliminary hearing in order to receive the information MCAO had all along.

20.     Plaintiffs also include Arizona Attorneys for Criminal Justice (AACJ), representing criminal defense attorneys who are denied the time and information required to meaningfully represent their clients.

21.     The most important rule in the prosecutor's code of professional ethics is "to seek justice . . . not merely to convict." MCAO's Retaliation Policy is surgically designed to do the opposite. Accordingly, Plaintiffs respectfully seek class certification and injunctive relief to end it.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action pursuant to 42 U.S.C. § 1983 (civil rights action) and 28 U.S.C. § 1331 (federal question).

23.     This Court may grant relief under 28 U.S.C. §§ 2201-02 (declaratory relief); Federal Rules of Civil Procedure 65 (injunctive relief) and 23 (class action); and the Sixth and Fourteenth Amendments to the U.S. Constitution.

24.     Venue is proper in the federal District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs and class members' claims occurred in this district.

## PARTIES

25.     Samuel Luckey is a 34-year-old Black man currently being prosecuted by Defendant. His case began in the EDC, where the DCA denied Mr. Luckey any discovery except a redacted police report and threatened him with a harsher plea offer if he exercised his right to a preliminary hearing guaranteed under the Arizona Constitution and Arizona law. He eventually succumbed to Defendant's pressure, waived his preliminary hearing,

1  and is awaiting trial.

2     26.   Mr. Luckey missed the birth of his daughter because he was in jail on this

3  arrest, unable to afford his $10,000 bail.

4     27.   Mr. Luckey lives in Phoenix, Arizona.

5     28.   He is suing on behalf of himself and all current and future EDC defendants

6  subject to the Retaliation Policy who have already waived their preliminary hearings.

7     29.   Aaron Dromiack is a 28-year-old Army veteran currently being prosecuted

8  by Defendant. Mr. Dromiack was severely beaten by police in his home, to the point that

9  had to be sent to the local Veteran's Affairs hospital with facial contusions and a herniated

10  disc in his neck. Because he resisted the beating, MCAO charged him with aggravated

11  assault. Mr. Dromiack asserts that he was merely defending himself and that body worn

12  camera footage will show this. Yet MCAO is refusing to produce the footage unless Mr.

13  Dromiack waives his preliminary hearing.

14     30.   Mr. Dromiack lives in Phoenix, Arizona, with his fiancée.

15     31.   He is suing on behalf of himself and all current and future EDC defendants

16  subject to the Retaliation Policy who must decide whether to waive their preliminary

17  hearing and/or reject their initial EDC plea offer.

18     32.   Plaintiff Arizona Attorneys for Criminal Justice is a non-profit organization

19  of attorneys who represent criminal defendants across Arizona, including those subject to

20  the Maricopa County EDCs. The Retaliation Policy makes it difficult for AACJ's members

21  to provide adequate, ethical counsel to EDC clients. For example, the Retaliation Policy

22  causes AACJ's member attorneys to unnecessarily devote increased time and resources to

23  the initial investigation of the charges against their clients, and often to unnecessarily

24  duplicate those investigative efforts after receiving discovery to which they were earlier

25  entitled.

26     33.   AACJ's mission has also been frustrated by the Retaliation Policy, and

27  AACJ has diverted time and resources to discuss, draft, and lobby for relevant rule changes

28  and train its members and other defense attorneys on navigating EDC cases and EDC-

1   related issues in light of the policy.

2        34.    Defendant Allister Adel is the elected County Attorney for Maricopa

3   County, Arizona. She is the official policymaker for the Maricopa County Attorney's

4   Office and is sued in her official capacity.

5   **FACTUAL ALLEGATIONS**

6   *The EDCs Were Created to Help Defendants Avoid Convictions.*

7   *MCAO Uses Them to Coerce Convictions Instead.*

8        35.    In 1996, Arizona passed Proposition 200, which lowered penalties for drug

9   possession, including prohibiting jail time for first-time, possession-only defendants. *See*

10  A.R.S. § 13-901.01 et seq. In turn, Maricopa County created the "Expedited Drug Courts,"

11  which initially went by several different names: Early Disposition Courts (EDC); Regional

12  Court Centers (RCC); and the Southeastern Facility (SEF). EDC focused on drug cases,

13  while RCC focused on lower-level felonies. SEF covered both types for the Mesa, Arizona

14  area. Now these courts have been merged into a single system called the EDCs.

15       36.    The original stated purpose of these courts was to "provide incentives to

16  early pleas and earlier treatment."[3] To this day, the Maricopa County Courts website claims

17  that "cases filed in EDC involve victimless charges of possession of illegal drugs for

18  personal use and/or paraphernalia. Most of the cases resolved in EDC are diverted into a

19  drug treatment program."[4]

20       37.    This is false. Maricopa County Court data from October 2018, for example,

21  indicates that only 8% of EDC cases resulted in diversion. Plaintiffs' counsel's preliminary

22  review of MCAO's own data, collected via a public records request, indicates that, from

23  _____

24  [3] Specialized Courts: Early Disposition Court, THE JUDICIAL BRANCH OF ARIZONA, MARICOPA COUNTY,

25  https://superiorcourt.maricopa.gov/criminal/specialized-

26  courts/#:~:text=Early%20Disposition%20Court,to%20as%20Expedited%20Drug%20Court (last updated Aug. 2, 2019, 1:44 PM).

27  [4] *Department Information: Early Disposition Court*, THE JUDICIAL BRANCH OF ARIZONA,

28  MARICOPA COUNTY, https://superiorcourt.maricopa.gov/criminal/department-information/ (last updated July 9, 2019, 5:04 PM).

1    January 2017 to January 2021, the number was even lower: 6.7%.

2           38.     MCAO is also filtering an increasing number and variety of cases through

3    the EDC system—presumably because the office has had success quickly pleading the

4    cases out and clinching easy, low-cost convictions. Indeed, during the COVID-19

5    pandemic, grand juries were closed and even more cases were subjected to EDC processes.

6           39.     Counsel's preliminary review of MCAO data indicates that MCAO sent

7    roughly 32,000 cases to the EDCs between January 2017 and January 2021. From 2019 to

8    2021, that represented roughly 40% of all criminal cases. And at least 30% of those cases

9    involved no drug-related charges whatsoever, much less only possession and paraphernalia

10   charges.

11          40.     Curiously, as MCAO sends more and more cases through the EDCs—and

12   extracts more and more constitutionally suspect felony convictions—it takes pains to draw

13   attention away from that reality. In its 2016 Annual Report, MCAO mentions the EDCs

14   only once, vaguely describing it as a system that "*can include* pretrial resolutions and

15   preliminary hearings." The report does not mention the Retaliation Policy, which punishes

16   people for seeking those very hearings.

17          41.     By 2020, MCAO was sending significantly more cases to the EDCs, but the

18   Annual Report for that year does not mention the EDCs at all. In fact, in the report, MCAO

19   congratulates itself for putting certain of its plea policies online—yet they do not include

20   the Retaliation Policy.

21          42.     The Retaliation Policy appears unique to the EDCs. On information and

22   belief, MCAO does not employ it outside of cases in the EDCs, at least not in this overt

23   manner. While MCAO places some of its policies online, including plea-related policies,

24   its website did not include anything about the Retaliation Policy  at the time of the filing

25   of the original complaint in this action. Likewise, the website does not include samples of

26   EDC forms disclosing the "presumptively harsher" and  "substantially harsher" threats.

27          43.     In fact, the Retaliation Policy *contradicts* elements of MCAO's more

28   generalized plea-bargaining policies. For example, Policy 7.1, titled Plea Agreements:

General Guidance, Timing of Offers, and Settlement Negotiations (effective August 13, 2020), states that "each DCA is expected to critically weigh the circumstances of each case to determine the appropriate initial offer. DCAs should engage in meaningful negotiations which includes discussing the case with defense counsel to learn as much as possible about the defendant. . . . *[I]t is not possible to handle every charge or every circumstance identically.*"

44.      The Retaliation Policy—including as reflected on EDC plea forms that post-date Policy 7.1—does precisely the opposite: it treats every case "identically," forecloses "meaningful negotiation," and worsens plea offers without regard to "the circumstances of each case," all while DCAs learn next to nothing about the defendant.

*MCAO Uses its Retaliation Policy to Coerce Quick, Low-Cost Pleas in the EDCs.*

45.      When a person is arrested and booked into jail in Maricopa County, they must be taken before a magistrate within twenty-four hours for an initial appearance from jail. Those not arrested are summonsed for their initial appearance.

46.      When a person is arrested and held in custody on a bond or non-bondable, the magistrate sets two dates: (1) a status conference  about six days after the initial appearance, and (2) a preliminary hearing about nine days after the initial appearance. If the defendant is not held in custody, the status conference is set out approximately fourteen days, and the preliminary hearing date is set out approximately eighteen days.[5]

47.      At the initial appearance, the magistrate also makes several critical determinations, including whether the accused person qualifies for a public defender and whether the person should be released or detained pending trial. Detention can and often does result from unaffordable cash bail.

48.      The magistrate makes the release decision with nothing more than a

---

[5] The timing of these settings are because, under Ariz. R. Crim. Pro. 5.1, "[a] preliminary hearing must commence before a magistrate no later than 10 days after the defendant's initial appearance if the defendant is in custody, or no later than 20 days after the defendant's initial appearance if the defendant is not in custody."

"probable cause statement" from the police—normally only a few paragraphs long, and told only from the police's perspective. At the initial appearance, indigent people have not yet been appointed a public defender to challenge the probable cause statement or examine the officers who made it. DCAs do not attend.

49.    Notably, a meaningful, adversarial bail review often does not take place. The initial appearance is not structured that way and the preliminary hearing, which could include a legally compliant bail review, often never happens because of the Retaliation Policy.

50.    Avoiding an adversarial detention review while the Retaliation Policy hangs over a person's head is a vital feature of how MCAO achieves quick pleas. Studies show that being detained without bail significantly increases the likelihood of pleading out, and pleading out quickly. Pretrial detention also makes it more difficult for someone to participate in their own defense.[6]

51.    Following the initial appearance, those who cannot afford their own attorney are typically appointed a public defender the day before the status conference. At that time, the prosecutor typically sends the accused person the police report and an initial plea offer, and that is all.

52.    The plea offer often has the following threat emblazoned on it:

> *THE OFFER IS WITHDRAWN IF THE WITNESS PRELIMINARY HEARING IS SET OR WAIVED. THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA. *NOTE: COUNTY ATTORNEY POLICY DICTATES THAT IF THE DEFENDANT REJECTS THIS OFFER, ANY SUBSEQUENT OFFER TENDERED WILL BE SUBSTANTIALLY HARSHER.

---

[6] See Nick Petersen, *Do Detainees Plead Guilty Faster? A Survival Analysis of Pretrial Detention and the Timing of Guilty Pleas*, 31(7) CRIM. JUST. POL'Y REV. 1015, 1025 (2019) (pretrial detainees plead out 2.86 times faster than released defendants); Will Dobbie, Jacob Goldin, & Crystal S. Yang, *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AM. ECON. REV. 201, 203 (2018); SUBRAMANIAN ET AL., *supra* note 1, at 38 n. 121.

53.     Other forms contain a similar threat:

This offer is contingent upon victim input. This offer will be withdrawn and no longer available after today's hearing date. This offer is withdrawn if the preliminary hearing is affirmed or waived. The offer may be changed or revoked at any time before the court accepts the plea.

NOTE: County Attorney policy dictates that if the defendant rejects this offer, any subsequent offer tendered will be substantially harsher.

**EDC PLEA OFFER**

**Defendant:** Gilberto Hernandez          **Date**: February 18, 2021

**CR#:** CR2021-104655-001

*THE OFFER IS WITHDRAWN IF THE WITNESS PRELIMINARY HEARING IS SET OR WAIVED. THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA.*

*NOTE: COUNTY ATTORNEY POLICY DICTATES THAT IF THE DEFENDANT REJECTS THIS OFFER, ANY SUBSEQUENT OFFER TENDERED WILL BE SUBSTANTIALLY HARSHER.*

54.     More recently, MCAO created the following generic form, though Plaintiffs cannot confirm if it is being used or supersedes other forms. Regardless, it still creates an unconstitutional presumption of retaliation against people who assert their rights.

**EDC PLEA OFFER**

**Defendant:** Scar Beelzebub Badguy          **Date**: August 3, 2021

**CR#:** CR2099-869815-003

*THIS PLEA IS INTENDED FOR EARLY DISPOSITION AND EXPIRES WHEN A FINDING OF PROBABLE CAUSE IS MADE OR WAIVED.  THE OFFER MAY BE CHANGED OR REVOKED AT ANY TIME BEFORE THE COURT ACCEPTS THE PLEA.  IF THE DEFENDANT REJECTS THE STATE'S PLEA OFFER, THERE MAY BE NO FURTHER PLEA OFFERS ABSENT A CHANGE IN CIRCUMSTANCES. SHOULD THE STATE ELECT TO MAKE ANOTHER PLEA OFFER AT SOME POINT BEFORE TRIAL, THE PRESUMPTION IS THAT IT WILL BE HARSHER.*

1    55.    DCAs also confirm the Retaliation Policy in emails to public defenders:

2

3    **From:** Patricia Grant <grantp@mcao.maricopa.gov>
     **Sent:** Thursday, May 27, 2021 9:32 AM
     **To:** Edie Lucero (OPD) <Edith.Lucero@maricopa.gov>
4    **Subject:** RE: State v. Maxine Lopez, CR2020-121573-001

5    Yes, that is our policy

6    **From:** Edie Lucero (OPD) <Edith.Lucero@maricopa.gov>
     **Sent:** Thursday, May 27, 2021 8:48 AM
7    **To:** Patricia Grant <grantp@mcao.maricopa.gov>
     **Subject:** RE: State v. Maxine Lopez, CR2020-121573-001

8    Patricia,

9    Will Maxine's plea be subject to MCAO "substantially harsher" policy for going forward on her
10   PH?

11   Thanks, Edie

12

13   **Edie Lucero (OPD)**

14   **From:**          Aaron Taylor <tayloa01@mcao.maricopa.gov>
     **Sent:**          Tuesday, June 22, 2021 7:42 AM
     **To:**            Edie Lucero (OPD)
15   **Subject:**       RE: Offer: State v. Taryn Tjernagel, CR2021-103935-001

16   Hi Edie,

17   Yes, the policy will apply here as well.

18   Best,

19   **Aaron Taylor**
     Deputy County Attorney | East Phoenix / Scottsdale Bureau
     Maricopa County Attorney's Office
20   tayloa01@mcao.maricopa.gov

21

22   **From:** Edie Lucero (OPD) <Edith.Lucero@maricopa.gov>
     **Sent:** Monday, June 21, 2021 4:35 PM
     **To:** Aaron Taylor <tayloa01@mcao.maricopa.gov>
23   **Subject:** RE: Offer: State v. Taryn Tjernagel, CR2021-103935-001

24   Hello Aaron,

25   If Taryn affirms her PH, will she be subject to MCAO's policy that the next plea will be "
26   substantially harsher," if she affirms?

27   Please let me know, thanks, Edie

28

56. In the days between the initial appearance and the first status conference, prosecutors typically refuse to provide accused persons and their counsel any additional information about the case, like witness statements, body camera footage, or drug test results. This is true even if they have the information in their possession and even if that information could exonerate the person, eliminate one or more charges, or mitigate the sentence.

57. Although Arizona's ethical guidelines require prosecutors to make "timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor," it is MCAO's common practice to refuse to provide any discovery at all, other than a single police report, until after the criminal defendant has made a decision on the EDC offer, and sometimes longer.

58. And because Arizona's criminal discovery rules require discovery to be provided at the preliminary hearing or arraignment in Superior Court, pressuring defendants to waive the preliminary hearing and plead guilty allows the prosecutor to claim they need not provide any discovery at all.

59. As a result, AACJ members practicing in the EDC's frequently are obligated to devote scarce investigation time and resources to the early investigation of their clients' charges due to the MCAO's refusal to provide initial discovery and to quickly gather mitigation material. This often includes locating and retrieving medical records, which is difficult to accomplish within the fast-paced EDC timelines MCAO enforces, as well as tracking down and interviewing witnesses, who are often not identified in the paltry disclosure MCAO provides in the EDCs. Sometimes, AACJ members are later required to unnecessarily duplicate their early investigation efforts after eventually receiving the tardy discovery to which their clients were earlier entitled.

60. By pressuring people to plead guilty in the EDCs, MCAO also does an end-run around Arizona Rule of Criminal Procedure 15.8, which requires DCAs to provide

discovery at the time a plea offer is made in Superior Court. It also provides for sanctions under certain circumstances if DCAs do not give a person 30 days after the offer is made to consider it, or if they do not make the required discovery disclosures when an offer is made.[7] But because hearings in the EDC occur prior to the filing of "an indictment or information in the superior court," Rule 15.8's protections do not apply to EDC.

61.     Upon information and belief, the distinction that MCAO makes between EDC and the Superior Court is largely illusory, particularly to the defendant and defense attorney. EDC appearances still take place in courtrooms (or, during the pandemic, over video). Magistrate judges still make binding decisions. And, most importantly, a coerced plea still ends the case, most often resulting in a felony conviction.

62.     However, there are no statutes or Arizona Rules of Criminal Procedure that create, govern, or even reference the EDCs, nor, to Plaintiffs' counsel's knowledge, are there any references to the EDCs in any published cases in the Arizona courts. MCAO therefore operates the EDCs as a Constitution-free zone, where prosecutors retain all their powers of investigation and conviction, but criminal defendants are effectively prohibited from asserting their rights under state and federal law.

63.     Given the lack of time to prepare for the status conference, the DCAs' refusal to provide discovery, defense attorneys' own constitutional and ethical obligations to provide effective assistance, and, most importantly, the Retaliation Policy looming over their clients' heads, criminal defendants and their attorneys are often forced to make an exceptionally difficult and unnecessary choice: accept a virtually blind plea deal or seek a continuance that delays their case. For those who are detained, this extends their time behind bars.

64.     According to Karen Emerson,[8] public defenders in most cases seek to

---

[7] Ariz. R. Crim. P. 15.8 ("If the court finds that the State's failure to provide a required disclosure materially affected the defendant's decision and if the State declines to reinstate the lapsed or withdrawn plea offer, the court--as a presumptive minimum sanction--must preclude the admission at trial of any evidence not disclosed as required . . . .").

[8] Karen Emerson is an Attorney Manager in the Maricopa County Public Defender's

- 14 -

1   continue the status conference and preliminary hearing for purposes of case investigation,

2   plea negotiation, additional attorney-client discussions, or other case-specific needs. These

3   continuances are sought because of the high-stakes nature of the EDC process. Defendants

4   typically have two options: plead guilty under the terms of the proffered plea agreement

5   without the protections afforded by a probable cause hearing, liberal pretrial discovery,

6   and pretrial suppression hearings, or reject the plea agreement and face a "presumptively

7   harsher" or even "substantially harsher" plea offer after probable cause is found at the

8   preliminary hearing or through a grand jury proceeding.

9       65.   If and when the parties appear at the status conference, sometimes after one

10  or more continuances, this is typically the latest date the DCA will allow the criminal

11  defendant to waive their right to a preliminary hearing. Waiver could result in an

12  acceptance of the plea at the status conference itself or continuation toward trial while

13  negotiations continue under the then-current plea offer.

14      66.   If the preliminary hearing is not waived—colloquially called "affirming the

15  prelim"—the DCA then typically makes what it calls a *Donald* advisement on the record

16  at the status conference. The *Donald* advisement is named after an Arizona case that

17  requires notice to the criminal defendant of the maximum possible prison sentence.[9]

18  However, MCAO also uses the *Donald* advisement to repeat the Retaliation Policy: that

19  the criminal defendant has chosen not to waive their right to a preliminary hearing, and

20  therefore MCAO will pull the current offer and any subsequent offer will be substantially

21  harsher.

22

23

24

25

---

26  Office.   Within the Public Defender's Office, she manages five divisions with
    approximately 90 public defenders.   She has been a public defender in Maricopa County
27  for 17 years and handled over a thousand cases in the Maricopa County Superior Court,
    including hundreds in the EDCs.

28  [9] *State v. Donald*, 10 P.3d 1193 (Ariz. App. 1st Div. 2000).

67.    MCAO openly acknowledges that the Retaliation Policy exists to process cases as quickly as possible and spare DCAs the inconvenience of working up cases. As one DCA phrased it in an email: "The purpose of EDC is to facilitate speedy resolutions . . . because once the case leaves EDC, MCAO must expend significant resources for trial preparations."

From: Aaron Taylor <tayloa01@mcao.maricopa.gov>
Sent: Monday, May 24, 2021 9:36 AM
To: Edie Lucero (OPD) <Edith.Lucero@maricopa.gov>
Subject: RE: Offer: State v. Taryn Tjernagel, CR2021-103935-001

Hi Edie,

The purpose of EDC is to facilitate speedy resolutions. An EDC plea is the most lenient offer a defendant will get because once the case leaves EDC, MCAO must expend significant resources for trial preparations.

Best,

**Aaron Taylor**
Deputy County Attorney | East Phoenix / Scottsdale Bureau
Maricopa County Attorney's Office
tayloa01@mcao.maricopa.gov

68.    In another email exchange, the DCA explains that providing body worn camera footage—to which the DCA clearly has access—is "inconsistent with the goal of EDC."

From: David Hanselman <hanselmd@mcao.maricopa.gov>
Sent: Tuesday, May 4, 2021 3:03 PM
To: Edie Lucero (OPD) <Edith.Lucero@maricopa.gov>
Subject: RE: State v. Maxine Lopez, CR2020-121573-001

Edie,

I see we have a status conference in this case tomorrow and recall that I did not yet respond to your email below. Providing BWC is inconsistent with the goal of EDC, which is to promote the early resolution of felony cases.  If we had to collect, review, and produce BWC in every case, or even the subset of cases where the Defendant thought there was a legal or factual defense, given the high volume of cases in EDC, it would bog the entire system down and swamp the law enforcement agencies.  Plus, it makes no sense to engage in discovery where the State has offered the Defendant diversion.  We've sent you the motion to suspend packet.  If the Defendant would like to avail herself of the diversion option, you can return that paperwork to our diversion department.  If not, the alternative offer in EDC would be to PDP 6 open and a stipulation to supervised probation, or she can straight waive or affirm.

Just let me know how she'd like to proceed.

Sincerely yours,

David L. Hanselman
Deputy County Attorney
Maricopa County Attorney's Office

69.   The prosecutor goes on: "[i]f we had to collect, review, and produce BWC in every case, *or even the subset of cases where the Defendant thought there was a legal or factual defense*, given the high volume of cases in EDC, it would bog the entire system down and swamp the law enforcement agencies."[10]

70.   This is precisely what is happening to Plaintiff Aaron Dromiack. He is asserting to MCAO that police attacked him first, and that any contact with them was in self-defense. Body worn camera footage would help support that defense, and yet the DCA in Mr. Dromiack's case is refusing to review or provide it as a matter of policy.

*Losing the Right to a Preliminary Hearing is Significant for EDC Defendants.*

71.   The Arizona Constitution makes preliminary hearings mandatory in felony cases that proceed by information, like those in EDC. Article 2, section 30, states that: "No person shall be prosecuted for a felony by information without having had a preliminary examination before a magistrate or having waived such preliminary examination."

72.   Arizona Rule of Criminal Procedure 5.1 implements this mandate: "A defendant has a right to a preliminary hearing if charged in a complaint with a felony."[11]

73.   Arizona Rule of Criminal Procedure 5.3 further requires that the magistrate at the preliminary hearing "must determine and state for the record whether the State's case establishes probable cause."

74.   In addition, the Arizona Supreme Court has held that, because an initial appearance "provides no opportunity for a defendant to present evidence or make any argument regarding the law or evidence," it is "ill-suited to support conclusive findings

---

[10] Moreover, despite this DCA's assertion that "it makes no sense to engage in discovery where the State has offered the Defendant diversion," refusal to engage in even limited discovery in these circumstances can lead to innocent people being pressured into onerous diversion requirements—with a felony conviction looming for even technical violations—when instead they should simply be walking free.

[11] Waiver of a preliminary hearing requires several factors to be met. The waiver must be in writing and it must be signed by the defendant, defense counsel, and the State. Ariz. R. Crim. P. Rule 5.1. Only after these substantive requirements are met can the prosecution continue their case against a defendant who has not been afforded a preliminary hearing.

affecting a defendant's liberty," and instead "serve[s] the limited function of providing some check on the ability of the state to hold a defendant . . . [but only] until either a preliminary hearing or grand jury proceeding is convened."[12]

75.    The Arizona Supreme Court has also held that the framers likely intended the preliminary hearing to act as "a shield to the citizen against the unwarranted zeal of prosecuting officers."[13]

76.    Therefore, more than a century of Arizona law makes clear that a person charged with a felony by information or complaint is entitled to a preliminary hearing, and for good reason. Yet MCAO makes it a matter of policy to deprive EDC defendants of that right.

77.    As noted above, the primary purpose of the preliminary hearing is to determine whether the state has probable cause to continue prosecuting someone, given that a grand jury has not served that function. If the magistrate at the preliminary hearing finds that MCAO has not established probable cause, the case is over.

78.    And even if MCAO establishes probable cause, the preliminary hearing can reveal police misconduct, unreliable testimony, or infirmities in the evidence-gathering process, which could lead to a later suppression motion.

79.    Further—and perhaps most importantly—after a preliminary hearing, when the case is bound over to Superior Court for trial, MCAO is required to begin providing more evidence to the defense. On information and belief, MCAO calls this being forced to "open the file." As indicated by the DCA emails above, MCAO is generally loathe to do so.

80.    In sum, the preliminary hearing is an essential protection for people facing criminal prosecution. It can end or undermine MCAO's case, or at least force DCAs to turn over discovery and endure the work of preparing for trial. Yet, rather than respect the

---

[12] *Segura v. Cunanan*, 219 Ariz. 228, 238–39, 196 P.3d 831, 841–42 (Ct. App. 2008).

[13] *Quen Guey v. State*, 20 Ariz. 363, 365 (1919).

preliminary hearing, MCAO strictly enforces the Retaliation Policy in order to coerce pleas and prevent cases from ever getting to that stage—much less all the way to trial.

*EDC Defendants and Their Attorneys Confirm that this Unconstitutional Retaliation Actually Occurs—and it Harms Them.*

81.     MCAO's Retaliation Policy harms real people. The following are a handful of examples, including the plaintiffs in this case.

82.     *Plaintiff Samuel Luckey*. Mr. Luckey is a 34-year-old Black man who recently welcomed the birth of his daughter. Police arrested him for drug and weapons charges after two witnesses implicated him during an unrelated traffic stop.

83.     Based on these two hearsay accounts, MCAO charged Mr. Luckey with two counts of sale, one count for possession of drug paraphernalia, and one count for possession of a firearm. Neither the police nor the witnesses ever personally viewed him selling drugs or carrying a weapon.

84.     According to Mr. Luckey's former defense attorney, Edith Lucero,[14] at Mr. Luckey's initial appearance after his arrest, the magistrate imposed a $10,000 bond. Mr. Luckey made clear that he could not afford that amount and requested alternative conditions of release. Mr. Luckey also told the judge that, if incarcerated pretrial, he would miss the birth of his daughter. The magistrate stated that he had "received a written recommendation from the state, with respect to this case, which the court had considered." The magistrate then imposed a $10,000 cash-only bond.

85.     MCAO pushed Mr. Luckey's case quickly through the EDCs and denied any discovery except a redacted police report. MCAO offered only a plea deal including felony convictions and a prison term from two to five years. Per its Retaliation Policy, MCAO

---

[14] Edith Lucero is a public defender in the Maricopa County Public Defender's Office, where she has handled hundreds of cases. She previously represented Mr. Luckey. She has been at the office for approximately 1.5 years, following her recent return. She previously spent 11 years at the office: approximately five years in the Trial Group and approximately six years in the Appeals Division. She subsequently worked as an administrative law judge for the Arizona Department of Transportation, and then for the U.S. Department of Homeland Security as an Immigration and Customs Enforcement attorney.

1   also threatened Mr. Luckey with a harsher plea offer if he rejected the deal and affirmed

2   his right to a preliminary hearing.

3   86.   During his status conference, Mr. Luckey told the EDC prosecutor and judge

4   that he felt "threatened" by the Retaliation Policy. He said he "had no choice" but to waive

5   his preliminary hearing because prosecutors were not disclosing any additional evidence

6   for him to make an informed decision. He said he was "damned if I do, damned if I don't."

7   87.   Despite these distressed statements, the DCA covering the hearing said

8   nothing. The judge accepted the waiver.

9   88.   In addition to being coerced out of his rights, Mr. Luckey has already spent

10  three long months in pretrial detention during a pandemic, missed the birth of his daughter,

11  and lost both his food stamps and unemployment insurance.

12  89.   *Plaintiff Aaron Dromiack.* Aaron Dromiack is a 28-year-old veteran of the

13  U.S. Army. He lives in Phoenix with his new fiancée, and he also struggles with alcohol

14  abuse disorder. In June 2021, he suffered a relapse and, while drunk, locked his fiancée out

15  of the house. Mr. Dromiack's fiancée called Phoenix police to get her back in and remove

16  Mr. Dromiack. She did not want to press any criminal charges.

17  90.   When police arrived, Mr. Dromiack answered the door voluntarily. Then,

18  rather than deescalating the situation, police tackled and beat Mr. Dromiack. They punched

19  him several times in the head even after he was subdued on the ground. He was admitted

20  to the VA hospital that night with facial contusions, a neck contusion, a cervical disc

21  herniation, bruises, swelling, and severe pain.

22  91.   In the struggle, Mr. Dromiack also admits that he resisted, in an attempt to

23  save himself from the beating. Therefore, despite that police were the aggressors in the

24  situation, they arrested Mr. Dromiack, and MCAO charged him with aggravated assault, a

25  felony. MCAO assigned Mr. Dromiack to the EDCs and only are offering him 1.5 years in

26  prison. Despite MCAO's public proclamation that the EDCs exist to divert people with

27  substance abuse disorders like Mr. Dromiack away from the criminal justice system, they

28  are not offering him any diversionary or treatment options.

92.     And despite Mr. Dromiack's claims of self-defense, the DCA on his case refuses to provide body worn camera footage that could exonerate Mr. Dromiack entirely, or at least shed additional light on the case. The DCA emailed Mr. Dromiack's attorney, Roland Rillos, the following explanation: "Most defendants want to view BWC [body worn camera], but EDC is a court of limited discovery and the BWC is generally unavailable at this stage."

93.     The DCA could easily obtain and disclose the footage, along with pictures and other evidence in the possession of the police. Instead, the DCA is making Mr. Dromiack pay for it. The price: his preliminary hearing.

94.     The DCA recently confirmed to Mr. Dromiack's attorney that if Mr. Dromiack affirms his preliminary hearing in an effort to receive more discovery, the next plea offer will be "presumptively harsher."

95.     *Michael Calhoun*. Michael Calhoun is a 61-year-old Black man with substance use disorder. He has a long history of drug convictions, mostly for possession of drugs and paraphernalia. He has never been convicted of or even arrested for a violent offense. He is also an artist and a father who has lived in the Phoenix area for decades.

96.     In September 2019, Mr. Calhoun was arrested for selling $20 worth of methamphetamine to an undercover officer. Mr. Calhoun was arrested, released, and heard nothing from the courts for roughly eighteen months.

97.     In April 2021, MCAO decided to not only revive the case in the EDCs, but offer Mr. Calhoun nothing lower than 9.25 years in prison for his $20 drug sale. Moreover, the new DCA on the case confirmed that, if Mr. Calhoun affirmed his preliminary hearing and proceeded toward trial instead of taking that draconian deal, the next offer would get substantially harsher.

98.     Despite MCAO's public proclamations that it uses the EDCs to divert drug offenders away from incarceration and towards treatment, and despite the fact that Mr. Calhoun is clearly a candidate for such treatment, MCAO has not offered diversion in this case. Instead, it is using prior drug convictions—charges for which MCAO did not offer

diversion or treatment either—to justify its current prison-only offer.

99.   Mr. Calhoun is currently deciding whether to assert his right to a preliminary hearing and trial, or whether to take a nine-year sentence for selling $20 worth of drugs. In either case, he is vividly confronted with the fear of dying in prison. There is currently a bench warrant for his arrest for failing to appear for a court appearance.

100.   *Deniece Pierce*. Deniece Pierce is a 51-year-old woman who had no criminal record before finding herself in the EDCs. She stole roughly $2,000 from her father by writing a series of false checks out of his account. When arrested, she admitted to it and, through her lawyer, simply asked for time to find a job to pay back the money.

101.   Instead, MCAO pushed her case quickly through EDC, offering a plea that required a felony conviction. They also ratcheted up the stakes by charging each check as a separate offense, many of which contained separate mandatory minimum sentences, even though it was clear that Ms. Pierce's wrongdoing was all part of a single misguided scheme. This stacking of charges created an extreme "trial penalty"—the difference between her exposure at trial (71.25 years in prison) and the comparatively "lenient" plea offer from MCAO (four years of probation and lifetime felony conviction on her record).[15]

102.   Ms. Pierce did not understand why MCAO was pushing the case so quickly and aggressively. She was deeply afraid of a potentially decades-long prison sentence, as well as receiving a substantially harsher offer if she asserted her rights. At one point, her attorney had to continue a case setting because she had a panic attack outside the courthouse.

103.   Her attorney, Chris Simonds,[16] told her the offer was unfair and she could affirm her preliminary hearing while continuing to try to pay back the money. Mr. Simonds

---

[15] The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It, NAT'L ASS'N OF CRIM. DEF. LAW. (July 10, 2018), https://www.nacdl.org/Document/TrialPenaltySixthAmendmentRighttoTrialNearExtinct.

[16] Chris Simonds currently owns and operates a private practice focusing on family law in Peoria, Arizona. He was previously employed as a public defender in Maricopa County, Arizona, from December 2017 through April 2021.

reported that Deniece weighed the costs and benefits of the plea and ended up pleading guilty to two charges, one felony and one misdemeanor, as offered by the DCA. Both attorney and client agreed it was unfair and punitive, and that the prosecutors had essentially pressured her into doing it.

104.    As a result, Ms. Pierce succumbed to the Retaliation Policy and took the deal.

105.    Since her conviction, Ms. Pierce has started her own cleaning company. She says she loses many potential clients because her felony conviction appears on background checks.

106.    *Levonta Barker*. Last year, Levonta Barker was minding his own business at a 7-Eleven in Phoenix when police suddenly drove up to him in the parking lot, threw him to the ground, and arrested him. He had no idea why. At some point, the police brought two people who said they had been robbed to the parking lot for a one-person lineup. All the victims could confirm was that their assailant was wearing a bandana, and so was Mr. Barker.

107.    Based on these "identifications," MCAO charged Mr. Barker with two counts each of aggravated assault and kidnapping. The DCA sent him a plea offer of 7.5 years in prison, followed by probation under "gang terms." Under the Retaliation Policy, that offer would get substantially harsher if Mr. Barker rejected the offer and/or affirmed his preliminary hearing.

108.    But MCAO had not even investigated the case yet. Luckily, Mr. Barker's attorney, Chris Simonds, had done so while working under the limited time constraints imposed by MCAO in the EDCs. Because of the severe limitations imposed by design in the EDC system, Mr. Simonds expended his own resources, and independently found Mr. Barker's booking photo. In doing so, he uncovered that Mr. Barker had been wearing a purple shirt at the time of his arrest; one of the police reports indicated the perpetrator was wearing a black one.

109.    Eventually, MCAO dropped the charges against Mr. Barker, but not before he had spent roughly a month in a COVID-infested jail, lost his job, lost an apartment he

was hoping to begin renting, missed his oldest son's birthday, and missed Christmas with his family.

110.    Worse yet, MCAO was clearly willing to convict an innocent man before doing any investigation. Indeed, they were pressuring him to take a plea deal or face a harsher offer if he asserted his rights. If Mr. Barker had not waited it out in jail—and many people cannot—MCAO would have secured the wrongful conviction, and Mr. Barker would still be behind bars today.

111.    *AACJ and Maricopa County Public Defenders*. Defense attorneys in Maricopa County confirm that this is a systemic problem. The Retaliation Policy has significantly hindered these attorneys' ability to represent their clients.

112.    Plaintiff AACJ is a non-profit membership organization whose mission includes supporting criminal defense attorneys and, by extension, their clients. Specifically, the organization is committed to "protect[ing] and insur[ing] by rule of law those individual rights guaranteed to all people, rich and poor alike, by the Arizona and Federal Constitutions, and to resist all efforts made to curtail such rights."[17] Its members represent clients in the EDCs every day. AACJ is deeply concerned that MCAO's Retaliation Policy places its members in compromising ethical positions by forcing them to advise clients without the necessary time or discovery. In fact, AACJ has sponsored at least three trainings on practicing in the EDCs, diverting its limited funds to address this problem. One of those trainings was titled, "Effective and Ethical Representation in Early Disposition Courts," which, in part, discussed the ethical dilemma imposed on criminal defense attorneys, including AACJ members, practicing in the EDCs.

113.    For example, according to Louis Fidel, President of the AACJ, in 2017 and 2018, the organization used its funds to co-sponsor CLE presentations entitled, "The Use of Subpoenas in Early Resolution Courts to Compel Discovery," that instructed on how criminal defense attorneys, including AACJ members, could use the subpoena power of the court to investigate their cases without meaningful discovery in EDC due to the

---

[17] AACJ Mission Statement, available at https://www.aacj.org/about.

1    MCAO's policy.

2        114.    AACJ has also devoted time to discussing and pushing for legislative and

3    policy changes directly relevant to the Retaliation Policy, including discussions to amend

4    Rule 15.8 to prevent prosecutor agencies from withholding discovery prior to the filing of

5    an information or indictment, which allows MCAO to impose its Retaliation Policy

6    without running afoul of the letter (but not spirit) of the rule, and drafting and pushing

7    comprehensive legislation  in 2021 that would require more transparency around MCAO

8    plea bargaining tactics.

9        115.    The Retaliation Policy also causes AACJ's member attorneys to

10   unnecessarily devote increased time and resources to the initial investigation of the charges

11   against their clients, and often to unnecessarily duplicate those investigation efforts after

12   eventually receiving discovery to which they were earlier entitled, because MCAO

13   prosecutors refuse to provide prompt discovery as part of their EDC practices.

14       116.    Edith Lucero is a Maricopa County deputy public defender (DPD) and a

15   former Arizona administrative law judge and federal Department of Homeland Security

16   official. She has spent 11 years in the Public Defender's Office between the trial and

17   appellate groups. She represents Michael Calhoun, represented Plaintiff Samuel Luckey

18   before he moved to the trial court, and has represented hundreds of other people in the

19   EDCs. She believes the Retaliation Policy, in combination with MCAO's refusal to provide

20   discovery while her clients are considering it, coerces her clients and leaves them believing

21   the system is unfair. This harms her clients and her attorney-client relationship with them.

22       117.    Hugo Polanco is a DPD in the Maricopa County Public Defender's Office,

23   who is currently assigned to handle cases in the EDCs and who has represented hundreds

24   of indigent clients. Mr. Polanco confirms that his clients have been threatened by the

25   MCAO's Retaliation Policy and that his clients have heard that threat read into the record

26   during their *Donald* advisements. Mr. Polanco believes that the policy is coercive and

27   retaliatory, threatens his clients simply for invoking their rights, and makes it extremely

28   difficult for him to carry out his duties as a public defender.

118.    Chris Simonds represented Deniece Pierce, Levonta Barker, and thousands of other people in the EDCs. Mr. Simonds believes that the Retaliation Policy is cruel, vindictive, and makes it difficult to ethically represent his clients. He recently left the Maricopa County Public Defender in part because of the policy.

119.    Gary Kula, the head of the Office of Public Defender, confirms that EDC cases are swallowing a greater and greater portion of his office's resources. He now devotes 34 full-time deputy public defenders and 12 support staff to these courts. At any given time, there are approximately 3,500 active cases pending there.  Over the past 11 months, 42 percent of the total cases resolved were resolved by plea in EDC.

120.    Coercing felony pleas via the Retaliation Policy has serious consequences. In Arizona, a felony conviction bars people from public housing and can cost them their driver's license and professional credentials—all of which makes it harder to earn a living and contribute taxes post-conviction. A felony conviction also bars people from jury service and negates their right to vote for *four years*—and, for anyone with more than one felony conviction, restoration of rights is extraordinarily difficult.

121.    In short, MCAO's Retaliation Policy may be a way for the office to secure quick, painless convictions. But for the thousands of people on the other side of these cases, the pain is real, and it can last a lifetime.

## **CLASS ACTION ALLEGATIONS**

122.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and classes of similarly situated individuals.

123.    The action contains two proposed classes:

(1)    All current and future people whom the MCAO has charged and assigned to the EDCs and who are subject to MCAO's blanket policy, practice, or custom of making or threatening to make plea offers harsher in response to people exercising their right to a preliminary hearing and/or trial, but who have not yet made the decision to affirm or waive their preliminary hearing, or reject or accept their initial plea offer (the "Pre-Waiver Class");

1 | and

2 |     (2)    All current and future people whom the MCAO has charged and assigned

3 | to the EDCs and who are subject to MCAO's blanket policy, practice, or

4 | custom of making or threatening to make plea offers harsher in response

5 | to people exercising their right to a preliminary hearing and/or trial, but

6 | who have waived their preliminary and/or rejected their initial plea offer

7 | (the "Post-Waiver Class").

8 |     124.    Plaintiff Aaron Dromiack seeks to represent the Pre-Waiver Class. Plaintiff

9 | Sam Luckey seeks to represent the Post-Waiver Class.

10 |     125.    This action has been brought, and may properly be maintained, as a class

11 | action under federal law. Both classes independently satisfy the numerosity, commonality,

12 | typicality, and adequacy requirements for maintaining a class action under Federal Rule of

13 | Civil Procedure 23(a), and both independently satisfy the requirements for certification

14 | under Rule 23(b)(2) or, in the alternative, 23(b)(1).

15 |     126.    *Numerosity*. Upon information and belief, there are at least 40 current people

16 | in both classes. Counsel's preliminary review of MCAO's own data, collected via a public

17 | records request, indicates that MCAO sent roughly 32,000 cases to the EDCs between

18 | January 2017 and January 2021. The head of the Maricopa County Office of Public

19 | Defender estimates there are roughly 3,500 active cases pending in EDC on any given day.

20 |     127.    Joinder is impracticable for both classes because (1) the class members are

21 | numerous, (2) delay will cause serious harms, including continued coerced convictions;

22 | (3) the classes are inherently transitory and include future members, (4) many of the class

23 | members are incarcerated, limiting their ability to communicate with counsel and institute

24 | individual lawsuits, and (5) the very nature of the Retaliation Policy makes the strength-

25 | in-numbers associated with class certification appropriate.

26 |     128.    *Commonality*. Certain common questions of law and fact exist across both

27 | of the proposed classes. Common questions of fact include whether MCAO indeed

28 | maintains the Retaliation Policy and how the office carries it out. A common question of

law is whether the Retaliation Policy violates people's Sixth and Fourteenth Amendment rights. These common questions of law and fact are amenable to common answers, including that eliminating the Retaliation Policy will cure the constitutional violations.

129.    For the Pre-Waiver Class, common questions include how the Retaliation Policy coerces people into foregoing their rights. For the Post-Waiver Class, common questions include if and when MCAO delivers discovery even after a preliminary hearing waiver.

130.    *Typicality*. Plaintiffs' claims in both classes are typical of and reasonably co-extensive with their respective class members' claims.

131.    *Adequacy*. Plaintiffs in both classes have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of their respective classes.

132.    Plaintiffs in both classes have no interests adverse to the interests of the proposed respective classes.

133.    Plaintiffs in both classes retained pro bono counsel with experience and success in the prosecution of civil rights litigation, including class action litigation and litigation alleging violations of trial rights.

134.    Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

135.    *Rule 23(b)(2)*. Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief. Plaintiffs therefore seek class certification under Rule 23(b)(2).

136.    *Rule 23(b)1)*. In the alternative, Rule 23(b)(1) is satisfied because pursuing separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members in both classes that would establish incompatible standards of conduct for the party opposing the proposed classes.

# CLAIMS FOR RELIEF

## Claim One

### *Prosecutorial Vindictiveness*

### *in Violation of the Fourteenth Amendment to the United States Constitution*

137.    The Due Process Clause of the Fourteenth Amendment prohibits prosecutors from acting with vindictiveness toward people accused of crimes.

138.    Prosecutors act with prohibited vindictiveness when they punish people in retaliation for exercising their basic trial rights.

139.    Defendant maintains and executes an official, blanket policy, practice, or custom of making plea offers in the EDCs harsher in response to people exercising their right to a preliminary hearing and/or trial (hereafter, "Retaliation Policy").

140.    Defendant expresses the Retaliation Policy on EDC plea offer forms, in emails with defense attorneys, and on the record during status conferences.

141.    Defendant routinely carries out the Retaliation Policy, punishing people for exercising their basic trial rights.

142.    The Retaliation Policy is actually vindictive because the Retaliation Policy's existence and execution is direct evidence of an expressed hostility or threat to criminal defendants in EDC for exercising their statutory, procedural, or constitutional rights.

143.    The Retaliation Policy is also presumptively vindictive because it poses a realistic likelihood of vindictiveness.

144.    Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Fourteenth Amendment rights.

145.    Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

**Claim Two**

***Excessive Burden on the Right to Trial***

***in Violation of the Sixth Amendment to the United States Constitution***

146.   The government may not promulgate a blanket criminal policy that contains higher penalties for asserting trial rights and lower penalties for pleading guilty.

147.   Whatever the government's goals in creating such a policy, those goals cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. If a criminal policy has "no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them," the Supreme Court has made clear that the policy is "patently unconstitutional."

148.   Defendant maintains and executes such a policy:  the Retaliation Policy.

149.   Defendant admits that the purpose and intended effect of the Retaliation Policy is to penalize those who choose to exercise their trial rights.

150.   Therefore, whatever Defendant's stated goals for the Retaliation Policy, it is patently unconstitutional. Specifically, it violates the Sixth Amendment.

151.   Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Sixth Amendment rights.

152.   Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

**Claim Three**

***Deprivation of a State-Created Liberty Interest***

***in Violation of the Fourteenth Amendment to the United States Constitution***

153.   The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving individuals of "life, liberty, or property" without due process of the law. Liberty interests protected by the Fourteenth Amendment include interests that are created by state law.

154.   Article 2, section 30, of the Arizona State Constitution mandates that a person who is prosecuted by information for a felony is entitled to a preliminary hearing.

- 30 -

155.    Arizona Rule of Criminal Procedure 5.1 implements this mandate by stating that a person has a "right" to a preliminary hearing. Arizona Rule of Criminal Procedure Rule 5.3 further requires that the magistrate at the preliminary hearing "must determine and state for the record whether the State's case establishes probable cause."

156.    By using mandatory language and restraining prosecutorial discretion in this way, Arizona state law creates a federally protected liberty interest in a person's right to a preliminary hearing including a probable cause determination.

157.    Defendant's Retaliation Policy illegally has coerced or will coerce Plaintiffs and putative class members out of this federally protected liberty interest.

158.    Defendant's Retaliation Policy is unique and atypical in comparison to its general plea-bargaining policy, which includes the requirements that "the assigned DCA must consider all relevant facts and circumstances known about the offense and defendant" and "DCAs should engage in meaningful negotiations."

159.    Through its Retaliation Policy, Defendant has caused and will continue to cause the violation of Plaintiffs' and putative class members' Fourteenth Amendment rights.

160.    Through its Retaliation Policy, Defendant has caused and will continue to cause irreparable harm to Plaintiffs and putative class members.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

161.    Certify this action as a class action and appoint named Plaintiffs as class representatives and the undersigned counsel as class counsel;

162.    Issue a judgment declaring that Defendant's blanket policy, practice, or custom of making plea offers in the EDCs harsher in response to people exercising their right to a preliminary hearing and/or trial violates the Fourteenth Amendment;

163.    Issue a judgment declaring that Defendant's blanket policy, practice, or custom of making plea offers in the EDCs harsher in response to people exercising their right to a preliminary hearing and/or trial violates the Sixth Amendment;

164.   As to both the Pre-Waiver Class and the Post-Waiver Class, issue a permanent injunction prohibiting Defendant from making or threatening to make plea offers in the EDCs harsher in response to people exercising their right to a preliminary hearing and/or trial;

165.   As to the Post-Waiver Class, issue a permanent injunction prohibiting Defendant from (1) asserting the preliminary-hearing waiver or plea agreement itself as a basis for opposing any class member's attempt to withdraw their preliminary-hearing waiver or plea because it was coerced by Defendant's policy, practice, or custom of making or threatening to make plea offers in the EDCs harsher in response to people exercising their right to a preliminary hearing and/or trial, and (2) retaliating against any class member for seeking or winning such a withdrawal;

166.   Grant Plaintiffs their reasonable attorneys' fees and expenses pursuant to 28 U.S.C. § 2412, 42 U.S.C. §§ 1988, and other applicable law; and

167.   Grant all further relief as this Court deems just and proper.

DATED: September 8, 2021                    Respectfully submitted,

*/s/ Jared G. Keenan*
Jared G. Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org

Somil Trivedi (*pro hac vice*)
American Civil Liberties Union
Foundation
Criminal Law Reform Project
915 15th St., NW
Washington, DC 20005
Telephone: (202) 715-0802
strivedi@aclu.org

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on September 8,  2021 I electronically transmitted the attached

3  document to the Clerk's office using the CM/ECF system for filing.  Notice of this filing will

4  be sent to all parties by operation of the Court's electronic filing system.

5

6                              */s/ Jared G. Keenan*
                              Jared G. Keenan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28